**Lyle ALZADO, Petitioner,**

v.

**BLINDER, ROBINSON & CO., INC., A Colorado corporation, and Arnold Tinter, Respondents.**

**No. 85SC370.**

Supreme Court of Colorado, En Banc.

Feb. 16, 1988.

Davis, Graham & Stubbs, Charles L. Casteel, Anthony J. Shaheen, Timothy M. Tymkovich, Denver, for petitioner.

Phillip E. Lowery, P.C., Phillip E. Lowery, Denver, for respondent Blinder, Robinson & Co., Inc.

Breit, Best, Richman and Bosch, John L. Breit, Susan Smith Fisher, Denver, for respondent Arnold Tinter.

KIRSHBAUM, Justice.

In *Blinder, Robinson & Co. v. Alzado,* 713 P.2d 1314 (Colo.App.1985), the Court of Appeals affirmed in part and reversed in part several judgments entered on jury verdicts in a civil action arising from disputes among promoters of an exhibition boxing match between petitioner Lyle Alzado (Alzado) and Muhammed Ali (Ali).[1] The jury returned one verdict for respondent Blinder, Robinson & Co., Inc. (Blinder–Robinson) and against Alzado on Blinder–Robinson's complaint alleging a breach by Alzado of a written guaranty agreement. The Court of Appeals in effect approved this verdict by affirming a trial court order that denied a post-trial motion filed by Alzado for judgment notwithstanding the verdict.

The jury also returned verdicts for Alzado against Blinder–Robinson on counterclaims filed by Alzado alleging breach of a personal services contract by Combat Associates, a limited partnership of which Blinder–Robinson was allegedly the general partner, and breach of an oral release and indemnity agreement by Blinder–Robinson. The Court of Appeals reversed the judgments entered on those verdicts and concluded that the evidence was insufficient to support Alzado's indemnity claim.

The Court of Appeals also reversed a judgment entered on a verdict for Alzado against respondent Arnold Tinter (Tinter) on a claim filed by Alzado alleging fraudulent misrepresentation. Finally, the Court of Appeals determined that the verdict for Blinder–Robinson on its guaranty agreement claim against Alzado was irreconcilable with the verdict for Alzado on his indemnity agreement claim against Blinder–Robinson. Accordingly, it ordered a new trial on both claims.

We granted certiorari to review these determinations.[2] We now affirm in part and reverse in part and remand the case for further proceedings.

I

In the spring of 1979, Alzado, Alzado's former accountant, Tinter, and Alzado's former agent, Ronald Kauffman (Kauffman), formed Combat Promotions, Inc. to promote an eight-round exhibition boxing match in Denver, Colorado, between Alzado and Ali. Alzado, Tinter and Kauffman were the directors and sole shareholders of the corporation. Ali had agreed to engage in the match on the condition that prior to the event his attorneys would receive an

---

1. At the time of the bout, Alzado was a professional football player and Ali was the world heavyweight boxing champion.

2. Other determinations by the Court of Appeals are not before this court.

irrevocable letter of credit guaranteeing payment of $250,000 to Ali.

Combat Promotions, Inc. initially encountered difficulties in obtaining the letter of credit. Ultimately, however, Meyer Blinder (Blinder), President of Blinder–Robinson, expressed an interest in the event. Blinder anticipated that his company's participation would result in a positive public relations image for its recently opened Denver office. Blinder–Robinson ultimately agreed to provide the $250,000 letter of credit.

Blinder–Robinson insisted on several conditions to protect its investment. It required the formation of a limited partnership with specific provisions governing repayment to Blinder–Robinson of any sums drawn against the letter of credit. It also required Alzado's personal secured guarantee to reimburse Blinder–Robinson for any losses it might suffer. Alzado and Combat Promotions, Inc. accepted these conditions.

On June 25, 1979, an agreement was executed by Combat Promotions, Inc. and Blinder–Robinson creating a limited partnership, Combat Associates. Under the terms of the agreement, Combat Promotions, Inc. was the general partner and Blinder–Robinson was the sole limited partner. Blinder–Robinson contributed a $250,000 letter of credit to Combat Associates, and the partnership agreement provided expressly that the letter of credit was to be paid off as a partnership expense.

On the same day, June 25, 1979, Alzado executed a separate guaranty agreement with Blinder–Robinson. This agreement provided that if Ali drew the letter of credit, Alzado personally would reimburse Blinder–Robinson for any amount Blinder–Robinson was unable to recover from Combat Associates under the terms of the limited partnership agreement. As security for his agreement, Alzado placed a general warranty deed to his residence, an assignment of an investment account and a confession of judgment in escrow for the benefit of Blinder–Robinson. Thereafter, a separate agreement was apparently executed

by Alzado and Combat Associates providing that Alzado would receive $100,000 in compensation for the exhibition match but subordinating any payment of that sum to the payment of expenses of the match, including, if drawn, the letter of credit.[3]

Approximately one week before the date of the match, Alzado announced that he might not participate because he feared he might lose the assets he had pledged as security for the guaranty agreement. Alzado informed Blinder of this concern, and the two met the next day in Blinder–Robinson's Denver office. Tinter, Kauffman and Ali's representative, Greg Campbell, were also present. Subsequently, on July 14, 1979, the event occurred as scheduled.

Few tickets were sold, and the match proved to be a financial debacle. Ali drew the letter of credit and collected the $250,000 to which he was entitled. Combat Associates paid Blinder–Robinson only $65,000; it did not pay anything to Alzado or, apparently, to other creditors.

In January of 1980, Blinder–Robinson filed this civil action seeking $185,000 in damages plus costs and attorney fees from Alzado pursuant to the terms of the June 25, 1979, guaranty agreement. Alzado denied any liability to Blinder–Robinson and asserted several affirmative defenses to the complaint. His fifth defense asserted that Blinder–Robinson had waived and released any claims under the guaranty agreement. His eighth defense asserted that Blinder–Robinson was estopped from enforcing the terms of the guaranty agreement.

Alzado also filed two counterclaims against Blinder–Robinson. The first alleged that because of its conduct Blinder–Robinson must be deemed a general partner of Combat Associates and, therefore, liable to Alzado under the agreement between Alzado and the partnership for Alzado's participation in the match. The second counterclaim alleged that in July of 1979 Blinder–Robinson orally agreed to release Alzado from his obligations under the

**3.** This contract is not a part of the record; however, none of the parties disputes the existence or contents of said agreement.

guaranty agreement and to indemnify him against any economic loss he might incur as a result of the match. Alzado also filed crossclaims alleging breaches of fiduciary duties and fraudulent misrepresentations against Tinter and Kauffman and filed a third party complaint against Blinder personally. The third party complaint was dismissed by the trial court at the close of the evidentiary portion of the case; that order has not been appealed.

The jury returned a verdict in favor of Blinder–Robinson and against Alzado in the amount of $185,000 on Blinder–Robinson's complaint. The jury also returned two verdicts in favor of Alzado and against Blinder–Robinson, as follows: $92,500 on Alzado's claim that Blinder–Robinson, as a general partner, was responsible for Combat Associates' debt to Alzado, and $100,-000 on Alzado's claim of an oral agreement of waiver and indemnification. Finally, the jury returned verdicts in favor of Alzado in the amount of $100,000 each on his crossclaims against Kauffman and Tinter.[4]

Alzado filed motions for amendment of judgment on his second counterclaim, pursuant to C.R.C.P. 59(e), and for judgment notwithstanding the verdict, pursuant to C.R.C.P. 50, with regard to the verdict awarding Blinder–Robinson $185,000. In the C.R.C.P. 59(e) motion he asserted that the jury's $100,000 verdict for indemnification should be raised to $185,000 to fully indemnify Alzado for the sum the jury found he owed Blinder–Robinson. In his C.R.C.P. 50 motion he argued, *inter alia,* that Blinder–Robinson's claim should have been dismissed because the guaranty agreement is unenforceable under the Uniform Limited Partnership Law of 1931.[5] The trial court denied these motions.

Blinder–Robinson also filed a motion for judgment notwithstanding the verdict or, alternatively, for new trial with regard to the two verdicts entered against it on Alzado's counterclaims. Blinder–Robinson asserted that the evidence failed to establish that it exercised sufficient control of Combat Associates' activities to be deemed a general partner thereof or that it entered into any release and indemnification agreement with Alzado. It also argued that the jury's verdict in its favor on the guaranty agreement claim was inconsistent with the verdict in favor of Alzado on his second counterclaim. The trial court denied the motion. Blinder–Robinson, Tinter and Kauffman then filed appeals, and Alzado filed a cross-appeal.

The Court of Appeals affirmed the trial court's denial of Alzado's C.R.C.P. 50 motion directed to Blinder–Robinson's $185,-000 judgment against Alzado, concluding that the June 25, 1979, guaranty agreement was neither void nor unenforceable, and also affirmed the trial court's denial of Alzado's motion for judgment notwithstanding the verdict regarding this claim. The Court of Appeals reversed the trial court's denial of Blinder-Robinson's motion for judgment notwithstanding the verdict with respect to Alzado's first counterclaim, concluding that the evidence failed to establish that Blinder–Robinson's conduct constituted control of Combat Associates, and reversed the verdict against Tinter on the ground that essential elements of deceit by false representation had not been proved.[6] The Court of Appeals then reversed the judgments entered on the original complaint and on Alzado's second counterclaim on the ground that the jury verdicts returned thereon were inconsistent. The case was remanded for trial on Blind-

---

**4.** At the conclusion of Alzado's presentation of evidence, the trial court dismissed Alzado's crossclaim of breach of fiduciary duty against Tinter. Thus, the jury returned a verdict for Alzado against Tinter only on the crossclaim of fraudulent misrepresentation. The verdict in favor of Alzado and against Kauffman was based on crossclaims alleging both fraudulent misrepresentation and breach of fiduciary duty.

**5.** Alzado had raised this issue in a motion for summary judgment filed pursuant to C.R.C.P. 56

prior to the selection of jurors; the trial court denied the motion.

**6.** Kauffman filed his appeal *pro se* and moved for and was granted the right to join in Tinter's brief on appeal. However, Tinter's brief did not discuss the judgment against Kauffman. In view of these circumstances, Kauffman's appeal was deemed abandoned by the Court of Appeals.

er–Robinson's claim and on Alzado's second counterclaim.

## II

Alzado argues that the Court of Appeals erred in affirming the trial court's order refusing to set aside the jury's verdict with respect to Blinder–Robinson's guaranty agreement claim. We conclude that the trial court's order was correct, although we reach this conclusion on grounds quite different from those articulated by the Court of Appeals.

■ Alzado asserts that the limited partnership agreement establishing Combat Associates is void and that, consequently, the guaranty agreement may not be enforced as a matter of law. In general, a guaranty agreement is not enforceable if the underlying obligation upon which it is based is void. *See Ryder Truck Rental, Inc. v. Kramer*, 263 Ark. 169, 563 S.W.2d 451 (1978) (payee not allowed to enforce guaranty on promissory note held void due to usurious interest rate); *Wells v. Comstock*, 46 Cal.2d 528, 297 P.2d 961 (1956) (payee precluded from enforcing guaranty on purchase agreement for illegally issued stock); *International Multifoods Corp. v. Mardian*, 379 N.W.2d 840 (N.D.1985) (where contract between principal and creditor unlawful, guarantor is not liable); *Moore v. White Motor Credit Corp.*, 708 S.W.2d 465, 472 (Tex.App.1985) ("[o]nly where the underlying obligation is void for illegality will the guaranty fall with it"). Under Alzado's two-fold argument, the enforceability of the guaranty agreement turns upon the validity of the limited partnership agree-ment. Our initial inquiry, therefore, must focus on Alzado's assertion that the Combat Associates limited partnership agreement is void.

■ Alzado argues that the limited partnership agreement is void because it violates section 7–61–117, 3A C.R.S. (1986). Specifically, he contends that section 4.4 of the agreement impermissibly grants Blinder–Robinson, a limited partner, a priority over other partnership creditors.

Section 7–61–117 of the Uniform Limited Partnership Law of 1931 [7] provides in pertinent part as follows:

**Withdrawal or reduction of limited partner's contribution.** (1) A limited partner shall not receive from a general partner or out of partnership property any part of his contributions until:

(a) All liabilities of the partnership, except liabilities to general partners and to limited partners on account of their contributions, have been paid or there remains property of the partnership sufficient to pay them;

(b) The consent of all members is had, unless the return of the contribution may be rightfully demanded under the provisions of subsection (2) of this section; and

(c) The certificate is canceled or so amended as to set forth the withdrawal or reduction.

Section 4.4 of the limited partnership agreement treats the letter of credit supplied by Blinder–Robinson as an expense of the partnership.[8] It provides that the gen-

---

**7.** Sections 7–61–101 to –130, 3A C.R.S. (1986), commonly known as the "Uniform Limited Partnership Law of 1931," codifies the Uniform Limited Partnership Act of 1916. In 1981, the General Assembly adopted the Revised Uniform Limited Partnership Act (1976). *See* §§ 7–62–101 to –1201, 3A C.R.S. (1986). Pursuant to § 7–61–129.5, the Uniform Limited Partnership Law of 1931 applies to all limited partnerships formed between April 11, 1931, and November 1, 1981. Because the partnership agreement here in question was entered into June 25, 1979, sections 7–61–101 to –130 are controlling.

**8.** Section 4.4 of the limited partnership agreement states as follows:

*Application of Gross Receipts to Expenses.* It is hereby expressed [sic] agreed by and be-

tween the Partnership that the General Partner shall have full discretion to utilize the first $35,000.00 raised through ticket sales to satisfy any Expenses Appurtenant to the Exhibition Boxing Match. It is further agreed that any gross receipts received by the Limited Partner in excess of $35,000.00 shall be applied as follows:

(a) Twenty percent (20%) may be utilized to pay Expenses Appurtenant to the Exhibition Boxing Match in the sole discretion of the General Partner.

(b) Eighty percent (80%) of such expenses shall be deposited with the bank issuing the Letter of Credit for the purpose of satisfying the personal contract of Muhammad Ali. Said amounts shall continue to be deposited

eral partner, Combat Promotions, Inc., shall allocate the first $35,000 of partnership ticket sale income to payment of expenses of the match. It then provides, in effect, that 80% of all gross receipts in excess of $35,000 shall be deposited with the bank issuing the letter of credit.[9] While there was no direct testimony at trial indicating that the total expenses of the match exceeded $35,000, Tinter's testimony that the partnership was not able to satisfy all its liabilities to its creditors permits the inference to be drawn that the partnership's debts were in excess of that sum.

The expense payment plan established by section 4.4 of the limited partnership agreement allots the first $35,000 of partnership ticket sale proceeds to be distributed to pay "Expenses Appurtenant to the Exhibition Boxing Match." Pursuant to the definitional section of the limited partnership agreement, the phrase "Expenses Appurtenant to the Exhibition Boxing Match" includes:

(i) The payment of any and all monies required by contracts executed by Combat, its shareholders, or the Limited Partnership, for the purposes of promoting, advertising, preparing, or otherwise bringing to fruition the Exhibition Boxing Match herein referred to. The personal service contracts of Lyle Alzado and Muhammed Ali are specifically included in the provisions of this Section.

(ii) The reimbursement of any amounts expended by Combat or its shareholders prior to the execution of this Agreement where those expenditures were directly related to the promotion, advertising, preparation or otherwise aided in bringing to fruition the Exhibition Boxing Match herein referred to.

(iii) The payment of "Expenses Appurtenant to the Exhibition Boxing Match" shall be conditioned upon the presentation of adequate documentation showing the obligations or expenditures set forth in (i) and (ii) above.

Because the expense payment scheme allocates this first $35,000 to pay non-partner creditors, the agreement does not on its face guarantee that Blinder–Robinson will receive an unlawful priority over other partnership creditors. In the event the match generated sufficient revenues, the formula established by section 4.4 would not result in any preference to Blinder–Robinson. Therefore, the guaranty agreement cannot be deemed void on its face. *See Moore v. White Motor Credit Corp.,* 708 S.W.2d 465.

In resolving this issue, the Court of Appeals observed that "[t]here was no violation of the statute here because Blinder–Robinson's contribution to the limited partnership was not secured by partnership funds or guaranteed by a general partner." *Blinder, Robinson & Co. v. Alzado,* 713 P.2d 1314, 1317 (Colo.App.1985). In support of this proposition, the Court of Appeals relied upon *Kramer v. McDonald's Sys., Inc.,* 77 Ill.2d 323, 396 N.E.2d 504 (1979). The *Kramer* opinion, however, apparently includes consideration of provisions of section 13 of the Uniform Limited Partnership Act, codified in Colorado at section 7–61–114, 3A C.R.S. (1986). Section 7–61–114 defines the permissible scope of a limited partner's business transactions with the partnership in the following language:

---

with said bank until such time as a total of $250,000.00 has been deposited with said bank at which time any additional funds shall be applied against Expenses Appurtenant to the Exhibition Boxing Match in the sole discretion of General Partner. Except as provided in Section 4.3(a), no Net Profits shall be calculated or distributed prior to the payment of all Expenses Appurtenant to the Exhibition Boxing Match.

Although § 4.4(b) of the limited partnership agreement utilizes the term "expenses," at trial the parties indicated that the intent and effect of the agreement was to require the general part-

ner to deposit 80 percent of all gross receipts exceeding $35,000 with the bank.

**9.** Twenty percent of receipts received in excess of $35,000 were to be utilized in paying other match expenses. Thus, if the match expenses exceeded $35,000, Blinder–Robinson would receive a partial priority over some of the creditors of the partnership. Although denominated an expense, the letter of credit was Blinder–Robinson's sole contribution to Combat Associates. Blinder–Robinson does not dispute this fact.

**Transactions with limited partner.** (1) A limited partner also may loan money to and transact other business with the partnership and, unless he is also a general partner, receive, on account of resulting claims against the partnership, a pro rata share of the assets with general creditors.

(2) No limited partner shall, in respect to any such claim:

(a) Receive or hold as collateral security any partnership property; or

(b) Receive from a general partner or the partnership any payment, conveyance, or release from liability, if at the time the assets of the partnership are not sufficient to discharge partnership liabilities to persons not claiming as general or limited partners.

(3) The receiving of collateral security or a payment, conveyance, or release in violation of the provisions of subsection (1) of this section is a fraud on the creditors of the partnership.

Although the policy considerations underlying section 7–61–114 may well reflect the same desire to protect creditors' rights that is evidenced by section 7–61–117, the specific prohibitions of the two sections are quite distinct. Alzado has challenged the limited partnership agreement only on the ground that it is rendered void by section 7–61–117. Accordingly, the Court of Appeals analysis of his argument was misplaced.[10] However, for the reasons indicated, we affirm the conclusion of the Court of Appeals that the trial court did not err in denying Alzado's motion for judgment notwithstanding the verdict.

### III

Alzado next contends that the Court of Appeals erred in concluding that Blinder–Robinson's conduct in promoting the match did not constitute sufficient control of Combat Associates to justify the conclusion

**10.** We note that the remedy Alzado seeks for the alleged violation of § 7–61–117(1), 3A C.R.S. (1986)—a declaration that the limited partnership agreement is void—is not expressly provided by the Uniform Limited Partnership Law of 1931. To the contrary, § 7–61–118(2)(b), 3A C.R.S. (1986), provides that:

that the company must be deemed a general rather than a limited partner. We disagree.

A limited partner may become liable to partnership creditors as a general partner if the limited partner assumes control of partnership business. § 7–61–108, 3A C.R.S. (1986); *Silvola v. Rowlett,* 129 Colo. 522, 272 P.2d 287 (1954); *Roeschlein v. Watkins,* 686 P.2d 1347 (Colo.App.1983); *Evans Products Co. v. O'Dell,* 96 N.M. 500, 632 P.2d 735 (1981); *Brooke v. Mt. Hood Meadows Oregon Ltd.,* 81 Or. App. 387, 725 P.2d 925 (1986), *reconsideration allowed, opinion adhered to,* 83 Or.App. 358, 732 P.2d 36 (1987); *see also* § 7–62–303, 3A C.R.S. (1986), which provides that a limited partner does not participate in the control of partnership business solely by doing one or more of the following:

(a) Being a contractor for or an agent or employee of the limited partnership or of a general partner;

(b) Being an officer, director, or shareholder of a corporate general partner;

(c) Consulting with and advising a general partner with respect to the business of the limited partnership;

(d) Acting as surety for the limited partnership or guaranteeing or assuming one or more specific obligations of the limited partnership or providing collateral for an obligation of the limited partnership;

(e) Bringing an action in the right of a limited partnership to recover a judgment in its favor pursuant to part 10 of this article;

(f) Calling, requesting, or participating in a meeting of the partners;

(g) Proposing or approving or disapproving, by voting or otherwise, one or more of the following matters:

> (2) A limited partner holds as trustee for the partnership: ... (b) money or other property wrongfully paid or conveyed to him on account of his contribution.

(I) The dissolution and winding up or continuation of the limited partnership;

(II) The sale, exchange, lease, mortgage, pledge, or other transfer of any assets of the limited partnership;

(III) The incurrence of indebtedness by the limited partnership;

(IV) A change in the nature of the business;

(V) The admission or removal of a partner;

(VI) A transaction or other matter involving an actual or potential conflict of interest;

(VII) An amendment to the partnership agreement or certificate of limited partnership; or

(VIII) Such other matters as are stated in writing in the partnership agreement;

(h) Winding up the limited partnership pursuant to section 7–62–803; or

(i) Exercising any right or power permitted to limited partners under this article and not specifically enumerated in this subsection (2).

Early determinations regarding whether a limited partner's conduct constituted control of partnership business were largely fact-specific and did not attempt to state general standards for determining what acts evidence such control. Feld, *The "Control" Test for Limited Partnerships,* 82 Harv.L.Rev. 1471 (1969). More recent decisions construing section 7 of the Uniform Limited Partnership Act have also failed to provide definitive interpretations of what constitutes "control." Pierce, *Limited Partner Control and Liability Under the Revised Uniform Limited Partnership Act,* 32 Sw.L.J. 1301 (1978–79). One commentator has attributed this lack of definitive interpretation to the limited amount of litigation in this area and the tendency of courts to deal with section 7 control issues on an *ad hoc* basis. *Id.* at 1306. Any determination of whether a limited partner's conduct amounts to control over the business affairs of the partnership must be determined by consideration of several factors, including the purpose of the partnership, the administrative activi-

ties undertaken, the manner in which the entity actually functioned, and the nature and frequency of the limited partner's purported activities.

A judgment notwithstanding the verdict may be entered only if, when viewing the evidence in the light most favorable to the party against whom the motion is directed, reasonable persons could not reach the same conclusion as the jury. *Smith v. City & County of Denver,* 726 P.2d 1125 (Colo.1986); *Thorpe v. Durango School Dist. No. 9–R,* 41 Colo.App. 473, 591 P.2d 1329 (1978), *aff'd,* 200 Colo. 268, 614 P.2d 880 (1980). The record here reflects that Blinder–Robinson used its Denver office as a ticket outlet, gave two parties to promote the exhibition match and provided a meeting room for many of Combat Associates' meetings. Blinder personally appeared on a television talk show and gave television interviews to promote the match. Blinder–Robinson made no investment, accounting or other financial decisions for the partnership; all such fiscal decisions were made by officers or employees of Combat Promotions, Inc., the general partner. The evidence established at most that Blinder–Robinson engaged in a few promotional activities. It does not establish that it took part in the management or control of the business affairs of the partnership. Accordingly, we agree with the Court of Appeals that the trial court erred in denying Blinder–Robinson's motion for judgment notwithstanding the verdict with respect to Alzado's first counterclaim.

Alzado contends, in the alternative, that the actual management of the partnership's daily business activities is irrelevant to Blinder–Robinson's status for purposes of liability because Blinder–Robinson's power and authority over the partnership assets rendered it liable as a general partner. He finds this alleged unlimited authority in the expense distribution formula contained in section 4.4 of the limited partnership agreement. Alzado cites no authority, and we are aware of none, in support of the theory that provisions of a limited partnership agreement structuring expenses and establishing net profit and

loss distribution formulae may themselves render a limited partner liable as a general partner for partnership debts.[11] In theory it may be true that particular provisions of a limited partnership agreement might so circumscribe the general partners' ability to make management decisions as to constitute conclusive evidence of control by the challenged limited partner. We do not view the terms of the Combat Associates limited partnership agreement as constituting such conclusive evidence.

■ Alzado finally asserts that Blinder–Robinson fostered the appearance of being in control of Combat Associates, that such actions rendered Blinder–Robinson liable as a general partner and that this conduct allowed third parties to believe that Blinder–Robinson was in fact a general partner. The evidence does not support this argument. Certainly, as Vice President of Combat Promotions, Inc., the general partner of Combat Associates, Alzado had no misconception concerning the function and role of Blinder–Robinson as a limited partner only. The Court of Appeals concluded that the evidence failed to establish that Blinder–Robinson exercised control over the business affairs of Combat Associates. We agree with that conclusion.

## IV

Alzado argues that the Court of Appeals erred in concluding that the jury verdicts on the complaint and the second counterclaim were irreconcilable and in finding the evidence insufficient to support Alzado's indemnity agreement claim. We disagree with the conclusion of the Court of Appeals that the evidence was not sufficient to support the jury's determination that Blinder–Robinson agreed to indemnify Alzado from any losses incurred as a result of the match. However, we agree with the con-

clusion of the Court of Appeals that the verdicts are not reconcilable.

### A.

■ An agreement to indemnify another is an agreement by one person to hold another person harmless from such loss or damage as may be specified in the agreement. See *Fidelity & Deposit Co. of Maryland v. Hershey*, 93 Colo. 215, 25 P.2d 178 (1933); *Hall v. Cannon*, 90 Colo. 465, 9 P.2d 1057 (1932); *Bullock v. Lewis*, 22 Colo.App. 449, 125 P. 849 (1912); *see also* E. Farnsworth, *Contracts* § 6.3 (1982) (under an indemnity contract, "one party (the *indemnitor*) promises to hold another party (the *indemnitee*) harmless from loss or damage of some kind, irrespective of the liability of any third person") (emphasis in original); *Restatement of Security* § 82 comment 1 (1941) ("A contract to indemnify is one where the promisor agrees to save a promisee harmless from some loss, irrespective of the liability of a third person"). As with other contracts, indemnity agreements can be made orally as well as in writing, *Williams v. White Mtn. Constr. Co.*, 749 P.2d 423 (Colo.1988); *see Bullock v. Lewis*, 22 Colo.App. 449, 125 P. 849, and may be construed in view of all the circumstances surrounding the transaction, *Fidelity & Deposit Co. of Maryland v. Hershey*, 93 Colo. 215, 25 P.2d 178. An indemnity agreement "is to be given such a meaning as would be attached to it 'by a reasonably intelligent person ... knowing all the circumstances prior to and contemporaneous with the making of the integration.'" *Fidelity & Deposit Co. of Maryland v. Hershey*, 93 Colo. at 218, 25 P.2d at 179 (quoting Restatement of Contracts § 230 (1932)).

At trial both Alzado and Blinder testified that about one week prior to the date set for the match Alzado placed a telephone call from Denver to Blinder in Las Vegas, Nevada, where Blinder was vacationing.

---

11. Alzado cites *Hirsch v. duPont*, 396 F.Supp. 1214 (S.D.N.Y.1975), *aff'd*, 553 F.2d 750 (2d Cir. 1977), and *Dwinell's Central Neon v. Cosmopolitan Chinook Hotel*, 21 Wash.App. 929, 587 P.2d 191 (1978), in support of his assertion. In *Hirsh*, the court held that limited partnership interests are securities as defined in § 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), and

§ 2(1) of the Securities Act, 15 U.S.C. § 77b(1). In *Dwinell's Central Neon*, the Washington Court of Appeals held that the plaintiff's failure to make an attempt to comply with statutory filing requirements rendered a limited partner liable as general partner. These cases do not support Alzado's assertion.

During this conversation Alzado stated that he feared he might lose all his assets and that he might not participate in the event. Blinder suggested that they meet in Denver the next day and try to solve these problems. Blinder flew back to Denver and a meeting did take place in Blinder–Robinson's office the next day.

The testimony presented at trial concerning the statements made at the meeting were predictably conflicting.[12] Blinder testified that he told Alzado the house could remain in escrow until he, Blinder, realized sufficient profits from investing the fund Alzado had placed in escrow to cover any "shortfall" that might occur. Alzado testified that Blinder said he didn't want anything from Alzado or from anybody, that no one was in jeopardy of losing anything, that Alzado had "nothing to risk" and that the last thing Blinder wanted was to take Alzado's house. Greg Campbell, Ali's representative, testified that Blinder said Alzado didn't have anything to worry about, that Alzado would not lose his house, and that there need not be any losses. Tinter testified that Blinder indicated that he would help Alzado invest funds to realize sufficient profits to cover any losses. Alzado subsequently participated in the match.

■■■ This evidence is admittedly far from compelling on the question of the nature and extent of any commitment by Blinder–Robinson to indemnify Alzado. However, while the evidence might well support the opposite result, we conclude that, when considered under all of the circumstances surrounding the meeting and viewed in the light most favorable to Alzado, *see, e.g., In re P.N.,* 663 P.2d 253 (Colo. 1983), the direct and circumstantial evidence was sufficient to support the jury's

verdict. At trial both Alzado and Blinder–Robinson stressed the importance of the jury's role in assessing credibility in determining what actually transpired at the July meeting. In our view, the evidence was sufficient to permit the jury to exercise that role and, in so doing, to find that in July Blinder–Robinson did orally agree to indemnify Alzado from losses resulting from the match. We, therefore, reverse the contrary conclusion of the Court of Appeals.

### B.

■■■ Jury verdicts will not be reversed for inconsistency if the record discloses any evidentiary basis to support the verdicts. *City of Aurora v. Loveless,* 639 P.2d 1061 (Colo.1981); *In re E.A.L. and A.J.L.,* 714 P.2d 508 (Colo.App.1985); *Phillips v. Monarch Recreation Corp.,* 668 P.2d 982 (Colo.App.1983). An appellate court addressing a challenge to assertedly inconsistent verdicts must carefully examine the instructions, the verdict forms and the evidence in resolving this question. The record indicates that these jury verdicts are not reconcilable under the claims of the parties and the instructions given to the jury.

Blinder–Robinson's complaint was based on the guaranty agreement executed by Alzado and Blinder–Robinson on June 25, 1979. Alzado filed affirmative defenses of waiver, release and estoppel to the complaint,[13] asserting that at a meeting in July of 1979, held a week before the date set for the match, Blinder–Robinson in essence abandoned or lost its rights under the guaranty agreement. At trial, the jury was instructed generally concerning Alzado's defenses to the complaint and was also given the following specific instruction:[14]

---

**12.** In view of our determination in Part IV(B) that a new trial must be awarded on the second counterclaim, it would be inappropriate to do more than characterize generally the testimony presented at trial.

**13.** Alzado's fifth affirmative defense asserted that Blinder–Robinson's claims "are barred by its waiver and release of any claims against Alzado which it may have had under the terms of the [g]uaranty [a]greement." Alzado's eighth

affirmative defense alleged that Blinder–Robinson was estopped from making any claim against Alzado under the guaranty agreement because of Blinder's conduct.

**14.** Instruction No. 12 apparently attempts to combine the defense of waiver and the defense of estoppel. No party has objected to this or any other instruction defining these defenses; therefore, our analysis of their content does not imply approval thereof.

## JURY INSTRUCTION NO. 12

The defendant, Lyle Alzado, is not legally responsible to the plaintiff, Blinder–Robinson & Co., Inc. on its claim of breach of guaranty if the affirmative defense of waiver and estoppel is proved. This defense is proved if you find all of the following:

1. The plaintiff by its words or conduct voluntarily and intentionally surrendered its right to enforce the Guaranty Agreement forever;

2. The defendant reasonably relied upon the plaintiff's intentional surrender of its right to enforce the Guaranty Agreement forever;

3. The defendant materially changed his positin [sic];

4. The change was to the defendant's detriment.

If you find that any one or more of these four propositions has not been proved by a preponderance of the evidence, then you must find that the defense of waiver and estoppel is unavailable to the defendant.

Alzado suggests that there is no inconsistency in the jury's verdict for Blinder–Robinson on the complaint and its verdict for Alzado on the second counterclaim because the rejection of Alzado's defense of waiver did not necessarily signify a finding that there was no oral contract in July of 1979. Instruction No. 12 states that Alzado asserts a single defense of "waiver and estoppel" containing four elements, and that the jury must find every one of those elements for Alzado to prevail on this defense. Thus, in rejecting this defense the jury could have concluded that in July Blinder–Robinson "voluntarily and intentionally surrendered its right to enforce the guaranty agreement forever," but that Alzado failed to establish one or more of the remaining three elements recited in Instruction No. 12. From this limited perspective, the jury's verdict for Blinder–Robinson on the complaint would not be inconsistent with its verdict in favor of Alzado on his second counterclaim; both verdicts could reflect the finding that Blinder–Robinson had agreed to release Alzado from any claims under the guaranty agreement.

However, this analysis ignores other critical instructions given to the jury. Instruction No. 13 defines the defense of "release" as follows:

## JURY INSTRUCTION NO. 13

A release is an agreement, supported by consideration, whereby a person having a claim or right surrenders it to the person against whom the claim exists or the right is to be enforced.

Instruction No. 13 required Alzado to establish consideration for the alleged July oral contract releasing him from his obligations under the June 25 guaranty agreement. However, as a defense to Alzado's second counterclaim Blinder–Robinson also raised the issue of the sufficiency of the consideration for the alleged July oral contract.[15] The jury, therefore, was required to determine whether at the time the alleged oral contract was entered into Alzado

The instructions generally describing Alzado's affirmative defenses create additional inconsistencies. Instruction No. 9 states that Alzado "asserts that [Blinder–Robinson] waived, released, and is estopped from asserting any rights under the guaranty...." Instruction No. 10 also states that Alzado asserts defenses of release, waiver and estoppel. However, Instruction No. 10 contains the following direction to the jury respecting its verdicts:

"Your verdict must be for [Blinder–Robinson] unless you find that it ... waived its rights under the guaranty and is estopped from asserting any claim on the guaranty...."

Although Instruction No. 13 defines the term "release," the jury was not specifically instructed to render a verdict for Alzado if it found

there was in fact a "release." While the parties do not suggest that these inconsistencies constitute error, they may well have contributed to juror confusion.

15. Neither Blinder–Robinson's answer to Alzado's counterclaim nor its pretrial data certificate expressly set forth failure of consideration as a defense to Alzado's second counterclaim. However, in a pretrial motion for summary judgment Blinder–Robinson argued that the alleged July oral agreement was unenforceable for lack of consideration because Alzado was at that time already obligated to participate in the match. Instruction No. 24, as set forth in the opinion, informed the jury of Blinder–Robinson's position on this issue.

was already obligated to participate in the match. The jury's responsibility to make that critical determination was reinforced by the language of the only instruction defining "consideration," Instruction No. 19. That instruction states as follows:

### JURY INSTRUCTION NO. 19

The performance of an act which a contracting party is already obligated to perform is not sufficient consideration for a new contract.

If you find that the defendant Lyle Alzado was already obligated to participate in the Exhibition Boxing Match, then you must find that there was no oral contract with plaintiff Blinder Robinson & Co. to discharge Mr. Alzado from the Guaranty, the Assignment, the Confession of Judgment and the Warranty Deed or to indemnify Mr. Alzado.

On the other hand, if you find that the defendant was not already obligated to participate in the Exhibition Boxing Match, then you may find that there was a contract to release and indemnify Mr. Alzado.

Instruction No. 19 not only informed the jury that performance of an act already required does not constitute consideration for a new agreement, but also directed the jury concerning the significance of its decision regarding consideration in relationship to its verdict on Alzado's second counterclaim.

The conclusion that the jury's resolution of the issue of consideration was critical to its decision respecting the rights and responsibilities of Alzado and Blinder–Robinson under the alleged agreements is compelled by examination of Instruction No. 24. That instruction informed the jury of the elements of Alzado's second counterclaim and of Blinder–Robinson's defenses to such counterclaim, as follows:

### JURY INSTRUCTION NO. 24

In order for the defendant Lyle Alzado to recover from plaintiff Blinder, Robinson & Co., Inc. on his counterclaim of breach of express contract, you must find all of the following have been proved:

1. Mr. Alzado entered into an oral contract with Blinder, Robinson & Co., Inc. where Mr. Alzado agreed to proceed with the Exhibition Boxing Match, in exchange for which Blinder, Robinson & Co., Inc. agreed not to exercise its rights under the Guaranty, the Assignment, the Confession of Judgment, or the Warranty Deed and to indemnify Mr. Alzado against any risk of economic harm and any loss of his assets as a result of the Guaranty, the Assignment, the Confession of Judgment, or the Warranty Deed or any other liability arising out of the Exhibition Boxing Match.

2. Blinder, Robinson & Co., Inc. has refused to release Mr. Alzado from the Guaranty and to indemnify Mr. Alzado. If you find that any one or more of these three [sic] propositions has not been proved by a preponderance of the evidence, then your verdict must be for the plaintiff Blinder, Robinson & Co., Inc.

On the other hand, if you find all of these propositions have been proved by a preponderance of the evidence, then your verdict must be for the defendant Lyle Alzado, unless you should also find that any one of plaintiff's affirmative defenses of estoppel, *failure of consideration*, or failure of a meeting of the minds have been proved by a preponderance of the evidence, in which event, your verdict must be for the plaintiff.

(emphasis added). This instruction clearly directed the jury to return a verdict against Alzado on his second counterclaim if it found there was no consideration for the alleged July oral indemnity contract. In finding for Alzado, the jury must have found sufficient consideration for the July agreement.

While the jury's verdicts on Blinder–Robinson's complaint and Alzado's second counterclaim might well be consistent insofar as the defense of waiver and estoppel is concerned, consideration of Instruction Nos. 13, 19 and 24 reveals that they cannot be reconciled when examined from the perspective of Alzado's affirmative defense of release. The jury was instructed that to

establish the defense of release Alzado was required to prove both that Blinder–Robinson agreed to release Alzado from any claims under the June 25 guaranty agreement and that such agreement was supported by consideration. By returning a verdict for Blinder–Robinson on the complaint, the jury necessarily rejected this affirmative defense. In view of its verdict finding a July agreement by Blinder–Robinson to release and indemnify Alzado,[16] the only basis under these instructions upon which it could have rejected Alzado's defense of release to the complaint is the conclusion that the July agreement was not supported by consideration. Yet, in rejecting Blinder–Robinson's defense to Alzado's second counterclaim, the jury necessarily concluded that the July agreement was supported by consideration. The two positions are not reconcilable.

The inconsistency of these two verdicts is further evidenced by a brief analysis of the jury's damages awards. The jury found Alzado liable to Blinder–Robinson for $185,000 on the guaranty agreement. It also found that Blinder–Robinson agreed to "release and indemnify" Alzado from any losses he sustained as a result of the guaranty agreement or any other aspect of the match. However, it awarded only $100,000 to Alzado on this claim. The only evidence of loss by Alzado subject to the terms of the indemnity agreement was the sum of $185,000 due Blinder–Robinson under that agreement. To the extent the jury might have thought its verdict awarding Alzado $92,500 against Blinder–Robinson on Alzado's first counterclaim constituted some kind of "set off" to any indemnity agreement, it was incorrect. The $92,500 Alzado was found entitled to receive under the first counterclaim was a sum owed to him under the terms of his contract with Combat Associates—a gain, not a loss, to Alza-

do, and therefore not an obligation covered by any indemnity agreement by Blinder–Robinson.

Under these instructions, the pleadings and the parties' theories of the case, the verdict rejecting Alzado's affirmative defense of release to the complaint cannot be reconciled with the verdict rejecting Blinder–Robinson's affirmative defense of lack of consideration to Alzado's second counterclaim. Therefore, the Court of Appeals properly ordered the case remanded for new trial on the complaint and on Alzado's second counterclaim.

## V

Alzado asserts that the Court of Appeals erred in reversing the jury's verdict in his favor on his claim of false representation against Tinter. At trial, Alzado argued that Tinter induced him to sign the guaranty agreement by advising Alzado that the agreement would not create legal liabilities or economic risks and that the ticket sales from the exhibition would cover all of the expenses of the match. At the close of all the evidence, the trial court ruled that sufficient evidence had been presented to submit the claim based on false representation to the jury. The jury returned a verdict on this claim for Alzado and against Tinter in the amount of $100,000. The Court of Appeals reversed, noting that there was nothing in the evidence to show that Alzado relied on any representation made by Tinter. *See Smith v. City & County of Denver,* 726 P.2d 1125 (Colo.1986).

 The primary evidence presented at trial regarding any representations made by Tinter consisted of the following testimony by Greg Campbell, Ali's representative: "I believe Arnold Tinter told everybody there was 15,000 or 20,000 tickets sold; I don't remember." Campbell

---

**16.** The Court of Appeals opinion characterizes the July agreement as alleged in the second counterclaim as one of "waiver or release." As Instruction Nos. 9, 10, 12, 13 and 24 indicate, the parties were not consistent in using the terms "waiver," "estoppel," "release" and "indemnity." It is probably more accurate to view Alzado's second counterclaim as alleging breach of an oral indemnification agreement. It is not

uncommon to discover lack of clarity of expression in indemnity agreements. *See Bullock v. Lewis,* 22 Colo.App. 449, 125 P. 849 (1912); *Stier v. Shop Rite of Manalapan,* 201 N.J.Super. 142, 492 A.2d 1055 (1985). As Corbin observed, "a clear and definite mind is a rarity; an artist in the use of words is as great a rarity." A. Corbin, *Corbin on Contracts* § 534 (1951).

also testified, however, that Tinter's alleged statement was made *after* Alzado signed the guaranty agreement. Alzado also testified that Tinter did not explain the arrangements for the match until after the documents had been executed. Fraud consists of a false representation of a material existing fact, made with knowledge of or utter disregard for its falsity, with intent to induce another to rely upon the representation and to take detrimental action thereon. *Palmer v. A.H. Robins Co.*, 684 P.2d 187 (Colo.1984); *Morrison v. Goodspeed*, 100 Colo. 470, 68 P.2d 458 (1937). To claim damages from allegedly fraudulent statements, the plaintiff must establish detrimental reliance on the statements. *See Palmer v. A.H. Robins Co.*, 684 P.2d at 215. In deciding to execute the guaranty agreement, Alzado could not have relied on statements made subsequent to the date upon which the agreement was executed. The Court of Appeals did not err in reversing the judgment entered against Tinter.

Alzado also asserts that there is sufficient evidence in the record to support the jury's verdict based on a theory of deceit by concealment. The elements of fraudulent concealment are:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo.1987); *Kopeikin v. Merchants Mortg. & Trust Corp.*, 679 P.2d 599, 601 (Colo.1984); *Morrison v. Goodspeed*, 100 Colo. 470, 477–78, 68 P.2d 458, 462. At trial, however, Alzado did not base his claim against Tinter on fraudulent concealment and the jury was not instructed on such theory. Having failed to request instructions to conform to the evidence, or taken other steps at trial to permit the jury

to consider this new theory, Alzado cannot introduce such theory on appeal. *Sullivan v. Davis*, 172 Colo. 490, 474 P.2d 218 (1970); *Glass & Bryant Mercantile Co. v. Farmers' State Bank*, 83 Colo. 193, 265 P. 682 (1927); *Wickland v. Snyder*, 39 Colo.App. 403, 565 P.2d 976 (1977); *Rietveld v. Mountain States Tel. & Tel. Co.*, 485 P.2d 525 (Colo.App.1971); *Rutherford v. Scarborough*, 28 Colo.App. 352, 472 P.2d 721 (1970). The Court of Appeals did not err in reversing the judgment against Tinter.

## VI

For the foregoing reasons, we affirm the judgment of the Court of Appeals insofar as it declares the jury's verdicts on Blinder–Robinson's complaint and on Alzado's second counterclaim to be irreconcilable. We also affirm the judgment of the Court of Appeals insofar as it reverses the judgments entered at trial in favor of Alzado on his first counterclaim against Blinder–Robinson and on his crossclaim against Tinter and affirms the trial court's denial of Alzado's motion to set aside the jury verdict on Blinder–Robinson's complaint. The judgment of the Court of Appeals is reversed insofar as it concludes that the evidence at trial was insufficient to support the jury's finding of an agreement by Blinder–Robinson to indemnify Alzado from losses he sustained from his exhibition match with Ali. The case is remanded to the Court of Appeals with directions to remand the case to the trial court for further proceedings consistent with this opinion.

ERICKSON, J., does not participate.