23CA2151 Marrou Concrete v KLR Ent 12-05-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA2151
Larimer County District Court No. 22CV30293
Honorable Laurie K. Dean, Judge

Marrou Concrete, Inc., a Colorado corporation,

Plaintiff-Appellee,

v.

KLR Enterprises Inc., a Colorado corporation, d/b/a Specialty Auto Body;
Rowley's Auto Collision Experts, Inc., a Colorado corporation, d/b/a Iron
Mountain Collision,

Defendants-Appellants.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE SULLIVAN
J. Jones, J., concurs dubitante
Lipinsky, J., concurs in part and dissents in part

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 5, 2024

Jody N. Duvall, Fort Collins, Colorado, for Plaintiff-Appellee

Clifford L. Beem, A. Mark Isley, Danielle C. Beem, Denver, Colorado, for
Defendants-Appellants

¶ 1 Colorado's Motor Vehicle Repair Act (MVRA), §§ 42-9-101 to -113, C.R.S. 2024, requires that a customer seeking to enforce the MVRA in a civil action first "make written demand for the customer's damages" from the motor vehicle repair facility. § 42-9-113. This case requires us to determine whether a customer's series of communications satisfied this MVRA requirement when the customer both proposed to sell its damaged vehicle to the motor vehicle repair facility for $70,000 and characterized the same amount as its demanded damages.

¶ 2 Applying the plain and ordinary meaning of the MVRA to the facts of this case, we conclude that plaintiff Marrou Concrete, Inc.'s communications to defendants, Rowley's Auto Collision Experts, Inc., d/b/a Iron Mountain Collision (Iron Mountain), and KLR Enterprises Inc., d/b/a Specialty Auto Body (Specialty), constituted a written demand for its damages that satisfied the statute. Because we also disagree with Iron Mountain and Specialty's other contentions, we affirm the district court's judgment entered on jury verdicts in favor of Marrou Concrete.

¶ 3 Concurring dubitante, Judge J. Jones agrees that the judgment should be affirmed in full and joins in this opinion, except

for Part II.B.3, which he joins only as to the result. Concurring in part and dissenting in part, Judge Lipinsky would reverse the judgment entered in Marrou Concrete's favor on its MVRA claim but would otherwise affirm. He joins in Parts I and II.A of this opinion, as well as the portion of Part II.C that affirms the judgment entered against Iron Mountain on Marrou Concrete's breach of contract claim. Judge Lipinsky also joins in Judge J. Jones's concurrence dubitante, except for the first and final two paragraphs.

## I.     Background

¶ 4     Iron Mountain and Specialty are both motor vehicle repair facilities. The two facilities share a common owner, general manager, and bookkeeper.

¶ 5     In October 2021, Jordan Marrou, the owner of Marrou Concrete, took the company's 2021 Audi A4 to Specialty in Fort Collins to repair minor damage to the vehicle's rear bumper that it sustained in an accident. Allstate Insurance Company, the insurer of the other driver involved in the accident, agreed to pay for the Audi's repairs.

¶ 6     Although Mr. Marrou dropped off the vehicle at Specialty for the repairs, Hollie Marrou, Mr. Marrou's wife and a Marrou

Concrete employee, signed a written form authorizing *Iron Mountain* to perform the repairs. The form signed by Ms. Marrou bore both Iron Mountain's and Specialty's respective corporate logos, names, addresses, and telephone numbers.

¶ 7 Mr. Marrou went to retrieve the Audi at Specialty's shop several weeks after dropping it off. According to Marrou Concrete, Iron Mountain and Specialty failed to precisely match the bumper's paint to the rest of the vehicle. Mr. Marrou was "surprised" that the paint didn't match and requested that the bumper's paint be blended to match the paint on the rest of the vehicle.

¶ 8 Marrou Concrete alleged that, without authorization, Iron Mountain and Specialty then disassembled portions of the vehicle to attempt to blend the paint. The Marrous said they were "shock[ed]" when they visited the shop several days later and discovered the unauthorized disassembly. Mr. Marrou instructed Specialty to stop all further work on the vehicle. Specialty reassembled the Audi but wouldn't release the vehicle unless it received payment for the repairs. Marrou Concrete refused to pay for the repairs.

¶ 9    Through counsel, Marrou Concrete sent a written demand letter to Iron Mountain and Specialty seeking damages and proposing to settle the dispute by selling them the Audi, which was still in Specialty's possession, for $70,000. Iron Mountain and Specialty didn't agree to Marrou Concrete's demand.

¶ 10    Marrou Concrete then filed suit against Iron Mountain and Specialty, asserting claims for violations of the MVRA and breach of contract. At trial, Ms. Marrou testified that Marrou Concrete didn't want the Audi returned because the repair work "wasn't sufficient." She also identified different categories of damages that she alleged Marrou Concrete had suffered, such as rental car expenses and payments for the Audi's insurance and registration while it was in Iron Mountain and Specialty's possession. Mr. Marrou also testified that Marrou Concrete purchased a new vehicle in January 2022 for approximately $57,000 because they didn't want to continue paying for rental cars for "months on end."

¶ 11    The jury found for Marrou Concrete and against Iron Mountain and Specialty, separately finding that both defendants violated the MVRA and breached the repair contract with Marrou Concrete. The jury awarded Marrou Concrete $10,500 on its MVRA

claim and one dollar on its breach of contract claim, resulting in a total judgment of $31,501 after the court trebled Marrou Concrete's damages awarded under the MVRA. *See* § 42-9-113.

¶ 12 After trial, Iron Mountain and Specialty moved for judgment notwithstanding the verdict, asserting, as relevant here, that (1) Marrou Concrete didn't comply with the MVRA's requirement that the customer make a prelitigation demand "for the customer's damages," *see id.*; and (2) no reasonable juror could conclude that Iron Mountain was liable to Marrou Concrete because the evidence showed that it performed no repair work on the vehicle.

¶ 13 The court initially ruled that Marrou Concrete's prelitigation demand letter proposing to sell the vehicle to defendants satisfied the MVRA's written demand requirement but also that Iron Mountain couldn't be held liable because the evidence showed that only Specialty performed the repair work. After receiving additional briefing, however, the court reversed course and determined that the evidence supported holding both Iron Mountain and Specialty liable for Marrou Concrete's damages, consistent with the jury's verdict.

¶ 14    Iron Mountain and Specialty now appeal, maintaining that the court erred for the same two reasons raised in their motion for judgment notwithstanding the verdict.

## II.    Discussion

### A.    Overview of the Motor Vehicle Repair Act

¶ 15    The MVRA contains several provisions meant to "protect consumers." *Jones v. Stevinson's Golden Ford*, 36 P.3d 129, 133 (Colo. App. 2001); *see* §§ 42-9-104 to -113.  A motor vehicle repair facility must, for example, obtain the customer's written consent before performing repairs.  § 42-9-104(1)(a), C.R.S. 2024.  A motor vehicle repair facility must similarly provide the customer with an estimate of the total cost of any repairs, including the expected completion date, unless the customer waives, in writing, their right to receive an estimate.  § 42-9-104(2)(a)(I), (2)(b).

¶ 16    If any disassembly of the vehicle is necessary to provide the cost estimate, the MVRA imposes specific requirements on the motor vehicle repair facility:

> In the event that it is necessary to disassemble, or partially disassemble, a motor vehicle or a motor vehicle part in order to provide the customer with an estimate for required repairs, the written estimate . . . shall

show the cost of reassembly in the event that the customer elects not to proceed with the repairs of the motor vehicle or motor vehicle part. The estimate shall also include the total cost of labor and parts to replace those expendable items that are normally destroyed by such disassembly. No act of disassembly that would prevent the restoration of the same unit to its former condition may be undertaken unless the motor vehicle repair facility has fully informed the customer of that fact in writing on the work order and the customer consents to the disassembly.

§ 42-9-104(2)(c)(I). A motor vehicle repair facility must also record all repairs performed on the customer's invoice and provide the invoice to the customer when the vehicle is returned. § 42-9-108(1), C.R.S. 2024.

¶ 17    In the event of a dispute, the customer may seek to enforce the MVRA in a civil action and, if successful, is entitled to an award of treble damages. § 42-9-113. Section 42-9-113 states that "[t]he customer shall first make written demand for the customer's damages from the motor vehicle repair facility by certified mail at least ten days prior to the filing of any such action, exclusive of Saturday, Sunday, and any legal holiday." "Damages are a measure of the loss or harm, generally in the form of pecuniary compensation, resulting from an injury suffered by a person

8

because of the unlawful act, omission, or negligence of another."
*Wilcox v. Clark*, 42 P.3d 29, 30 (Colo. App. 2001).

¶ 18    Like other notice and demand statutes, the purpose behind section 42-9-113's written demand requirement is to provide the motor vehicle repair facility with notice of an impending claim and the opportunity to resolve the dispute before it turns into litigation. *Cf. Sure-Shock Elec., Inc. v. Diamond Lofts Venture, LLC*, 2014 COA 111, ¶ 13 ("The purpose of the notice requirement [for mechanics' liens] is to allow property owners to pay their debts before a lien is filed.").

### B.    Marrou Concrete's Demand for Damages

¶ 19    Iron Mountain and Specialty first contend that the court erred by denying their motion for judgment notwithstanding the verdict, arguing that Marrou Concrete's prelitigation demand letter didn't constitute a "demand for . . . damages" under the MVRA, § 42-9-113, but rather, a demand that they purchase Marrou Concrete's vehicle at an inflated price.

### 1.    Standard of Review

¶ 20    Appellate courts review de novo a district court's denial of a motion for judgment notwithstanding the verdict. *Smith v. Surgery*

*Ctr. at Lone Tree, LLC*, 2020 COA 145M, ¶ 8. A court may grant a motion for judgment notwithstanding the verdict where the evidence supporting the jury's verdict is insufficient as a matter of law or where no genuine issue as to any material fact exists, and the moving party is entitled to judgment as a matter of law. C.R.C.P. 59(e); *Belfor USA Grp., Inc. v. Rocky Mountain Caulking & Waterproofing, LLC*, 159 P.3d 672, 676 (Colo. App. 2006).

¶ 21     Appellate courts similarly review questions of statutory interpretation de novo. *Smith v. Exec. Custom Homes, Inc.*, 230 P.3d 1186, 1189 (Colo. 2010). A court's "primary duty" when construing a statute is to give effect to the General Assembly's intent, looking first to the statute's plain language. *Ferguson Enters., Inc. v. Keybuild Sols., Inc.*, 275 P.3d 741, 747-48 (Colo. App. 2011). If the statute's meaning is clear and unambiguous, the court applies the statute as written, unless doing so would lead to an absurd result. *E-470 Pub. Highway Auth. v. Kortum Inv. Co., LLLP*, 121 P.3d 331, 333 (Colo. App. 2005).

### 2.     Additional Background

¶ 22     On February 11, 2022, Marrou Concrete's counsel emailed a settlement offer to counsel for Iron Mountain and Specialty, stating

Marrou Concrete was willing to resolve the dispute "by selling the Audi in your client's possession to your client for $70,000." Iron Mountain and Specialty rejected Marrou Concrete's settlement offer and requested that Marrou Concrete instead pay for a portion of the vehicle's repairs.

¶ 23    On April 14, 2022, thirteen days before filing this lawsuit, Marrou Concrete's counsel sent a demand letter under the MVRA to Specialty and Iron Mountain's counsel via certified mail. The demand letter stated as follows:

> Please accept this letter as the written demand of my clients . . . pursuant to [section] 42-9-113 with regards to their dispute with your client, [Specialty and Iron Mountain]. My clients demand payment of the damages they have suffered due to your client's violation of the [MVRA], which amounts are included in the offer to resolve this matter that my clients made via email on February 11, 2022. My clients are still willing to accept payment of the amount offered on February 11, 2022, to resolve this matter upon the same terms and conditions as previously set forth. If your clients decline this demand or do not respond, my clients have and directed me to file the attached complaint as permitted by [section] 42-9-113.

11

Iron Mountain and Specialty didn't agree to pay Marrou Concrete's demand or seek additional information, prompting Marrou Concrete to initiate litigation.

### 3. Analysis

¶ 24 The district court correctly determined that Marrou Concrete's April 14 demand letter satisfied section 42-9-113. To satisfy the statute, the customer must (1) make a written demand for the customer's damages from the motor vehicle repair facility; (2) send the demand by certified mail; and (3) wait at least ten days before filing a civil action under the MVRA, exclusive of Saturdays, Sundays, and legal holidays. § 42-9-113. The parties only dispute the first element in this case.

¶ 25 In the April 14 demand letter, Marrou Concrete's counsel demanded "payment of the damages" that his client had allegedly suffered as a result of Iron Mountain's and Specialty's actions, stating that the amount of its claimed damages was included in its

prior settlement offer of $70,000.[1]  By requesting $70,000 and characterizing the amount as "damages," counsel provided an estimate of the measure of Marrou Concrete's loss or harm that it asserted resulted from Iron Mountain's and Specialty's unlawful acts or omissions.  Counsel's April 14 demand letter therefore constituted a demand for Marrou Concrete's damages, satisfying section 42-9-113.  *See Wilcox*, 42 P.3d at 30.

¶ 26     Iron Mountain and Specialty nonetheless argue that they had no way of knowing what portion of the demanded $70,000 reflected Marrou Concrete's damages and what portion reflected the Audi's purchase price.  This defect, they argue, required the court to either grant Iron Mountain and Specialty's motion for judgment notwithstanding the verdict or, at minimum, vacate the treble

---

[1] Iron Mountain and Specialty argue that Marrou Concrete's April 14 demand letter was defective because it incorporated a prior settlement offer by reference rather than restating the proposed settlement terms.  But nothing in section 42-9-113, C.R.S. 2024, prohibits referencing prior communications between the parties or their counsel as part of the customer's written demand for damages.

damages on Marrou Concrete's MVRA's claim.[2]  But counsel's April 14 demand letter said that the amount of Marrou Concrete's damages was "included," or enclosed, in its prior settlement offer. *See* Webster's Third New International Dictionary 1143 (2002) (defining "included" as "enclosed, confined, [or] embraced").  The only figure enclosed in Marrou Concrete's prior settlement offer was $70,000.  Iron Mountain and Specialty could therefore reasonably glean that Marrou Concrete viewed the entirety of the demanded $70,000 as its "damages."

¶ 27     Armed with this information, Iron Mountain and Specialty had notice of the amount that they would have to pay Marrou Concrete to prevent its MVRA lawsuit from moving forward.  Marrou Concrete's demand letter therefore fulfilled the legislative purposes

---

[2] As Iron Mountain and Specialty's argument suggests, the MVRA doesn't specify the consequences when a claimant fails to send a written demand that satisfies section 42-9-113.  For example, is a claimant who fails to comply with the written demand requirement barred from bringing their MVRA claim?  *See, e.g.*, § 24-10-109(1), C.R.S. 2024 (failure to comply with the Colorado Governmental Immunity Act's notice provision "shall forever bar any such action").  Or is the claimant merely ineligible to receive the civil penalties listed in section 42-9-113?  Or is the consequence something else altogether?  The statute doesn't say.  This court need not resolve these questions, however, because Marrou Concrete satisfied section 42-9-113's written demand requirement.

underlying section 42-9-113. *Cf. Sure-Shock Elec.*, ¶ 13; *see also Finnie v. Jefferson Cnty. Sch. Dist. R-1*, 79 P.3d 1253, 1258 (Colo. 2003) (in determining whether claimant satisfied the notice provision of the Colorado Governmental Immunity Act, the court "should consider whether the purposes of the statute were satisfied"). Contrary to Iron Mountain and Specialty's argument, nothing in section 42-9-113 required Marrou Concrete to itemize or explain in detail the basis of its claimed damages. *See Larrieu v. Best Buy Stores, L.P.*, 2013 CO 38, ¶ 19 (Courts "do not add words to a statute."). And notably, Iron Mountain and Specialty didn't express confusion over the amount of Marrou Concrete's demanded damages or seek additional information.

¶ 28    Even if a recipient of the April 14 demand letter might have interpreted counsel's use of "included" to mean that the amount of Marrou Concrete's claimed damages was a mere subset of some larger whole, *see* Webster's Third New International Dictionary 1143 (2002) (defining "include" in a second definition as "to place, list or rate as a part or component of a whole or of a larger group, class, or aggregate"), the letter still qualified as a written demand for damages under section 42-9-113. Under such an interpretation,

15

the amount of Marrou Concrete's claimed damages could be understood to be enclosed in its prior settlement offer *in addition* to the other terms and conditions of the offer. But the only additional information provided in Marrou Concrete's settlement offer was its proposal that Iron Mountain and Specialty purchase the damaged Audi for $70,000 — a sum that, again, Marrou Concrete's counsel characterized as "damages" in the demand letter. Nothing in either the settlement offer or the demand letter suggested that Marrou Concrete sought additional unspecified sums, above $70,000, as either damages or compensation for selling the Audi.

¶ 29    Iron Mountain and Specialty also argue that Marrou Concrete's demand letter and settlement offer sought a form of specific performance, not damages, by attempting to sell them the Audi at an inflated price. This argument fails for two reasons.

¶ 30    First, although section 42-9-113 requires that the customer's written demand seek "damages" — a requirement that Marrou Concrete's demand letter satisfied — the statute doesn't preclude a customer from including additional terms or conditions in their demand. Indeed, there is nothing unusual about a plaintiff including in its demand letter a condition that the defendant buy

16

back or retake possession of goods that the defendant has rendered defective. *See, e.g., Alling v. Universal Mfg. Corp.*, 7 Cal. Rptr. 2d 718, 721-22 (Ct. App. 1992).

¶ 31  Second, the parties' repair contract didn't authorize the sale of the vehicle to Iron Mountain and Specialty as a possible remedy for the customer, rendering such a sale unavailable as a form of specific performance. *See Air Sols., Inc. v. Spivey*, 2023 COA 14, ¶ 48 (specific performance serves as an alternative to an award of damages as a means of enforcing a contract and is intended to produce, as nearly as is practicable, the same effect that the performance due under a contract would have produced). And while Marrou Concrete alleged in its complaint that Iron Mountain and Specialty breached the repair contract, nothing in its demand letter or settlement offer suggested that its offer to sell the vehicle constituted an attempt to enforce that contract.

¶ 32  Iron Mountain and Specialty also appear to argue that Marrou Concrete's evidence of damages at trial fell far lower than the $70,000 that it requested in its April 14 demand letter. But just as section 42-9-113 doesn't prohibit the customer from including additional terms or conditions in its written demand beyond its

17

damages, nothing in the statute requires that the customer's evidence on damages at trial conform to the amount in their written demand. *See Dubois v. Abrahamson*, 214 P.3d 586, 588 (Colo. App. 2009) ("[W]e may not read additional terms into, or modify, the plain language of a statute . . . ."). A plaintiff who is approaching trial may sensibly choose to forgo presenting evidence on certain categories of questionable damages in favor of pursuing only those sums that discovery proved were supported by strong evidence.

¶ 33 Accordingly, because Marrou Concrete's demand letter satisfied section 42-9-113's requirements, the district court didn't err by denying Iron Mountain and Specialty's motion for judgment notwithstanding the verdict.

### C. Iron Mountain's Liability

¶ 34 Iron Mountain and Specialty also contend that the court erred by entering judgment against Iron Mountain, arguing that the undisputed evidence showed that Iron Mountain, a separate entity from Specialty, performed no services on Marrou Concrete's Audi. We disagree.

¶ 35     Iron Mountain and Specialty raised the issue of Iron Mountain's liability in their post-trial motion for judgment notwithstanding the verdict. The court initially agreed with Iron Mountain and Specialty and entered judgment against only Specialty notwithstanding the jury's verdict against both entities. The court reversed course, however, after receiving additional briefing from the parties and entered judgment, jointly and severally, against both Iron Mountain and Specialty.

1.     Standard of Review and Applicable Law

¶ 36     Both sides argue, and we agree, that we review de novo the court's ruling on Iron Mountain and Specialty's motion for judgment notwithstanding the verdict.[3] *See Surgery Ctr.*, ¶ 8. "A

---

[3] We note that the court reversed course and entered judgment against both Iron Mountain and Specialty after Marrou Concrete moved to amend the judgment under C.R.C.P. 59(a)(3) and (4). We normally review the court's ruling on such a motion for an abuse of discretion, not de novo. *See In re Marriage of Bochner*, 2023 COA 63, ¶ 12; *Skyland Metro. Dist. v. Mountain W. Enter., LLC*, 184 P.3d 106, 115 (Colo. App. 2007). But the parties urge us to apply a de novo standard of review, pointing out that Iron Mountain's liability was first raised in Iron Mountain and Specialty's motion for judgment notwithstanding the verdict. Given this posture and the parties' agreement, we choose to review the court's ruling de novo, although we would reach the same result even if we applied the more deferential abuse-of-discretion standard.

19

judgment notwithstanding the verdict may be entered only if, when viewing the evidence in the light most favorable to the party against whom the motion is directed, reasonable persons could not reach the same conclusion as the jury." *Alzado v. Blinder, Robinson & Co.*, 752 P.2d 544, 552 (Colo. 1988).

## 2.    Analysis

¶ 37    The jury heard the following evidence from which it could reasonably infer that Iron Mountain was involved in the repairs of Marrou Concrete's Audi:

- An Allstate representative discussed the Audi's repairs in emails with the companies' general manager, whose signature block included logos for both Iron Mountain and Specialty.  The signature block, however, showed a Loveland address, where Iron Mountain's shop was located.  The general manager also sent his emails from an Iron Mountain email address.

- Iron Mountain and Specialty's owner testified that the general manager spent "most of his time with Iron Mountain."

- Allstate sent a check for the Audi's repairs to Iron Mountain (albeit to an address associated with a different business also called Iron Mountain, which eventually returned the check to Allstate).

- The form that Ms. Marrou executed authorized Iron Mountain, not Specialty, to make repairs to the Audi.

- The general manager testified that Specialty is now merely a "remote hub" in Fort Collins. Customers visiting Specialty are "redirect[ed]" to Iron Mountain's shop in Loveland, and the general manager will "send a tow truck" or "transport their vehicle for them from Fort Collins to Loveland to do the repairs." Iron Mountain also completes all paperwork for both entities.

- Mr. Marrou previously took a company truck to Specialty for repairs; Specialty then transferred the vehicle to Iron Mountain for the repairs.

¶ 38 Viewing this evidence in the light most favorable to Marrou Concrete, as we must, we conclude that a reasonable juror could infer that Iron Mountain was involved in the repairs to the Audi, thus providing a basis for holding it jointly and severally liable

alongside Specialty. While Iron Mountain and Specialty presented other evidence suggesting that only Specialty performed repairs on the Audi, the jury was free to reject their evidence and resolve inconsistencies in the evidence against Iron Mountain and Specialty. *See Margenau v. Bowlin*, 12 P.3d 1214, 1219 (Colo. App. 2000) ("It is for the jury to determine the weight of, and to resolve conflicts and inconsistencies in, the evidence.").

¶ 39 We also disagree with Iron Mountain and Specialty's argument that "the veil of both corporations would have to be pierced" before Iron Mountain could be held liable. In a veil-piercing analysis, a court evaluates, among other things, whether the corporate entity is the "alter ego" of another person or entity. *Dill v. Rembrandt Grp., Inc.*, 2020 COA 69, ¶ 28. But here, the jury found *both* Iron Mountain and Specialty separately liable to Marrou Concrete on its MVRA and breach of contract claims, as shown by the separate verdict forms the jury filled out for each entity. And as discussed, the evidence supported the jury's verdicts. Given this, the jury didn't find, nor did it need to find, that Iron Mountain and Specialty were each other's alter ego.

¶ 40    We also aren't persuaded by Iron Mountain and Specialty's reliance on *Alzado*, 752 P.2d 544.  In *Alzado*, the supreme court determined that a limited partner in a partnership couldn't be held liable as a general partner because, on the record presented, it hadn't assumed sufficient control over the partnership's business. *Id.* at 551-53; *see also* § 7-61-108, C.R.S. 2024 (limited partner may become liable as a general partner if it "takes part in the control of the business").  But the court's fact-specific analysis in *Alzado* was governed by a provision of the Colorado Uniform Limited Partnership Act of 1981, section 7-62-303, C.R.S. 2024, which doesn't apply here.  Moreover, unlike *Alzado*, whether Iron Mountain assumed control over Specialty is immaterial because the jury found, with record support, that both entities were separately liable to Marrou Concrete based on their own conduct.

¶ 41    Accordingly, we conclude the record supports the court's decision to enter judgment against Iron Mountain, consistent with the jury's verdicts.

### D.    Appellate Attorney Fees and Costs

¶ 42    Marrou Concrete requests an award of its appellate attorney fees and costs under the MVRA, section 42-9-113, which provides

23

that the court "*may* award reasonable attorney fees and costs to the prevailing party." (Emphasis added.) A statute that uses "may" generally connotes permissive rather than mandatory action. *Sinclair Mktg. Inc. v. City of Commerce City*, 226 P.3d 1239, 1246 (Colo. App. 2009). Marrou Concrete also cites C.A.R. 28(b), 39, and 39.1 in support of its request.

¶ 43 Because we affirm the judgment, we grant Marrou Concrete's request for appellate costs. *See* C.A.R. 39(a)(2) ("[I]f a judgment is affirmed, costs are taxed against the appellant."); C.A.R. 39(c)(2) (the party seeking costs must file an itemized and verified bill of costs in the trial court within fourteen days of entry of the appellate mandate).

¶ 44 We deny, however, Marrou Concrete's request for its appellate attorney fees. Other than citing the above authorities, Marrou Concrete fails to develop any argument supporting the exercise of our discretion to award attorney fees on appeal. *See* C.A.R. 39.1 ("If attorney fees are recoverable for the appeal, the principal brief of the party claiming attorney fees must include a specific request, and explain the legal and factual basis, for an award of attorney fees."); *Andres Trucking Co. v. United Fire & Cas. Co.*, 2018 COA

24

144, ¶ 63 (denying party's undeveloped request for appellate attorney fees).

### III. Disposition

¶ 45 We affirm the judgment.

JUDGE J. JONES concurs dubitante.

JUDGE LIPINSKY concurs in part and dissents in part.

JUDGE J. JONES, concurring dubitante.

¶ 46 Judge Sullivan and I agree that the court's judgment should be affirmed in total. I write separately because while I agree with Judge Lipinsky that the written demand requirement of section 42-9-113, C.R.S. 2024, of the Motor Vehicle Repair Act (MVRA), requires the customer to state an amount of damages claimed, I'm not quite convinced that Marrou Concrete failed to comply with that requirement. At the same time, I'm not as sure as Judge Sullivan is that Marrou Concrete did so. So I join sections I, II.A, II.B.1 and 2, II.C, II.D, and III of Judge Sullivan's opinion in full and II.B.3 as to the result.[4]

Section 42-9-113 provides in full as follows:

> **Civil penalties.** In any civil action for the enforcement of this article, the court may award reasonable attorney fees and costs to the prevailing party, and a customer shall be entitled to treble damages for failure of any motor vehicle repair facility or any employee of such facility to comply with this article, except

---

[4] The potential bases for a dubitante opinion are covered in Jason J. Czarnezki, *The Dubitante Opinion*, 39 Akron L. Rev. 1 (2006); *see also People v. Carter*, 2021 COA 29, ¶ 60 n.1 (J. Jones, J., concurring dubitante). One such basis is that "the judge is unhappy about some aspect of the decision rendered but cannot quite bring himself to record an open dissent." Lon L. Fuller, Anatomy of the Law 147 (Penguin 1971) (1968).

26

for clerical errors or omissions; but in no event shall such damages be less than two hundred fifty dollars. The customer shall first make written demand for the customer's damages from the motor vehicle repair facility by certified mail at least ten days prior to the filing of any such action, exclusive of Saturday, Sunday, and any legal holiday. Such action shall be brought within the time period prescribed in section 13-80-103, C.R.S. [2024]

¶ 47 No reported case interprets this provision. And the MVRA doesn't expressly indicate the purposes it seeks to serve. But I think it's safe to assume, as a logical matter, that the written demand requirement is intended to, at the least, facilitate resolution of a dispute between a customer and a motor vehicle repair facility before the customer files suit. Colorado appellate courts have construed analogous notice and demand provisions as serving that purpose. *See, e.g.*, *City & Cnty. of Denver v. Crandall*, 161 P.3d 627, 632 (Colo. 2007) (one purpose of the notice requirement of section 24-10-109, C.R.S. 2024, of the Colorado Governmental Immunity Act is to enable the public entity to settle meritorious claims);[5] *Shaw Constr., LLC v. United Builder Servs., Inc.*, 2012 COA

---

[5] The notice required by section 24-10-109, C.R.S. 2024, must include "[a] statement of the amount of monetary damages that is being requested." § 24-10-109(2)(e).

24, ¶ 25 (construing the notice of claim procedure in section 13-20-802.5, C.R.S. 2024, of the Construction Defect Action Reform Act as intended to "facilitate out-of-court resolution of construction defect claims"), *overruled on other grounds by Goodman v. Heritage Builders, Inc.*, 2017 CO 13; *Sure-Shock Elec., Inc. v. Diamond Lofts Venture, LLC*, 2014 COA 111, ¶ 13 (the purpose of the notice of intent to lien provision of section 38-22-109(3), C.R.S. 2024 — a part of the statutes governing mechanics' liens — "is to allow property owners to pay their debts before a lien is filed").[6]

¶ 48    It is with that purpose in mind that we must determine whether Marrou Concrete's February 11, 2022, email and April 14, 2022, letter — considered in tandem — constituted a "written demand for the customer's damages from the motor vehicle repair facility" under section 42-9-113.  *See People v. Laeke*, 2012 CO 13M, ¶ 17 ("Our fundamental responsibility when we interpret a

---

[6] As I read the statute, when it says the customer "shall first make written demand . . . prior to the filing of any such action," it means that such a written demand is a prerequisite to filing "any civil action for the enforcement of" the MVRA.  § 42-9-113, C.R.S. 2024.  Thus, I agree with Judge Lipinsky that the failure to comply with the written demand requirement is a bar to suit.

statute is to give effect to the General Assembly's purpose or intent in enacting the statute."). This is a very close question, in my view.

¶ 49 As I see it, a written demand for the customer's damages must include, at a minimum, a statement of the amount of damages allegedly caused by the motor vehicle repair facility's failure to comply with the MVRA. Contrary to Marrou Concrete's assertion, construing the statute in this way doesn't add words to the statute. This is so because the commonly understood meaning of the word "damages" is "the *measure* of the loss or harm, generally in the form of pecuniary compensation, resulting from an injury suffered by a person because of the unlawful act, omission, or negligence of another." *Artery v. Allstate Ins. Co.*, 984 P.2d 1187, 1191 (Colo. App. 1999) (emphasis added) (citing dictionary definitions), *abrogated on other grounds by Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 224, 228-30 (Colo. 2001), *and Friedland v. Travelers Indem. Co.*, 105 P.3d 639, 645 (Colo. 2005); *see Colo. Milling & Elevator Co. v. Mitchell*, 58 P. 28, 29 (Colo. 1899) (noting that the "technical sense" of "damages" is "the amount which the injured party is entitled to recover"); *see also Godinez v. Williams*, 2024 CO 14, ¶ 20 (in construing words in a statute, we apply their

plain and ordinary meanings in accordance with common usage). And allowing a customer to satisfy the demand requirement merely by demanding that a motor vehicle repair facility "pay damages," without stating an amount, would do little, if anything, to facilitate resolution of the dispute before the filing of a lawsuit.

¶ 50    Marrou Concrete argues that, if it was required to include an amount of damages in its demand, it did so.  I have my doubts.  Recall, the February 11 email said, "After speaking with my clients, they would be willing to resolve this matter by selling the Audi in your client's possession for $70,000."  And the April 14 letter said, in relevant part, "My clients demand payment of the damages they have suffered due to your client's violations of the [MVRA], which amounts are included in the offer to resolve this matter that my clients made via email on February 11, 2022."  Below are a few observations about these communications:

- An offer to settle a dispute for a particular amount — which is how both missives characterized the February 11 email — isn't necessarily a statement of the amount of damages caused by the alleged wrongdoer's unlawful conduct.  Such an offer may equate to such damages,

30

but that is probably the case only rarely.  More often, it is simply an amount that takes into account potentially recoverable damages, attorney fees, costs, and the risks of litigation, among other things.

- It isn't at all clear what value Marrou Concrete attached to the Audi it offered to sell to defendants for $70,000.  It never communicated that sum to defendants before filing suit, much less in the purported demand.  So even if the $70,000 less the Audi's value represented Marrou Concrete's damages, defendants were left only to guess at what the net figure — that is, the damages claimed by Marrou Concrete — was.  How were defendants supposed to know the amount of the check they could write Marrou Concrete to cover its actual damages?

- The April 14 letter said that the damages were "included in the offer in the February 11 email."  This phrasing would have led defendants to believe that Marrou Concrete's claimed damages were part of a larger sum.  *See* Webster's Third New International Dictionary 1143 (2002) (defining "include").  But, again, how were

31

defendants to know how much of the larger sum constituted to Marrou Concrete's actual damages?

¶ 51 Against all this, Marrou Concrete now says that its damages were $70,000.[7] But there are serious problems with this assertion. First, in the district court, Marrou Concrete said, in responding to defendants' motion for summary judgment and defendants' post-trial motion, that the amount it demanded from defendants included, among other sums, an unspecified amount for attorney fees. And on appeal, they say it also included treble damages. But neither attorney fees nor treble damages are actual damages caused by the wrongdoer: They are penalties imposed if the customer prevails by proving a violation of the MVRA and resulting damages.[8]

¶ 52 Second, in the district court, Marrou Concrete said that $70,000 was an amount defendants needed to pay "to resolve this

---

[7] This implies that Marrou Concrete thought the Audi had no value.
[8] When the MVRA was enacted in 1977, section 42-11-109(3), C.R.S. 1977, the precursor to section 42-9-113, said, "In any civil action, a customer shall be entitled to his damages, including attorney's fees and costs . . . ." But two years later, the General Assembly amended the statute to take attorney fees and costs out of the category of damages and make them awardable, in the court's discretion, to "the prevailing party." Ch. 419, sec. 1, § 42-11-109(3), 1979 Colo. Sess. Laws 1589.

dispute without litigation."  Again, a settlement demand and a demand for damages usually aren't the same thing.

¶ 53     Third, Marrou Concrete argues, as it did below, that it wasn't possible for it to calculate its damages before it filed suit.  But if calculating its damages wasn't possible, how can Marrou Concrete claim that the amount it demanded constituted its actual damages?[9]  This seems to be a tacit — albeit unintended — admission that the $70,000 amount (less the Audi's unstated value) didn't represent its actual damages.

¶ 54     Despite my concerns, however, I would affirm because the statute — enacted in 1977 — doesn't clearly spell out how much information the required written demand should include, and Marrou Concrete did, after all, include a figure in the demand (albeit an ambiguous one).

¶ 55     I respectfully suggest that it is time for the General Assembly to amend the statute to create more clarity.  Does the demand have to state a good faith estimate of the customer's actual damages

---

[9] Under the statute, Marrou Concrete had one year to file suit.  That would seem to be plenty of time to come up with a good faith estimate of damages.

caused by the motor vehicle repair facility, as I believe it does?

Does the demand need to include an itemization of the sums

making up the damages by category or type of injury? Does the

failure to comply with the demand requirement mean the

customer's suit is barred, as I believe it does, or does it mean only

that the customer may not recover the penalties provided for in the

statute? Clarification of these issues would benefit customers,

motor vehicle repair facilities, attorneys, and the courts.[10]

---

[10] I agree with my colleagues as to defendants' separate challenge to the award against Iron Mountain Collision.

JUDGE LIPINSKY, concurring in part and dissenting in part.

¶ 56　　Settlement demands do not necessarily reveal the amount of the demanding party's damages.  A number may be included in a demand for tactical or psychological purposes.  A lawyer may insert a high number in a demand to convince the client of the lawyer's toughness or to instill fear in the heart of the opposing party.  Or the demand may represent the starting point of negotiations that the demander hopes will eventually lead to a settlement for a sum close to that party's actual damages.

¶ 57　　The plain language of the Motor Vehicle Repair Act (the Act), §§ 42-9-101 to -113, C.R.S. 2024, demonstrates that the General Assembly understood the material distinction between a settlement demand and the measure of a party's damages when it enacted the Act's civil penalty section.  § 42-9-113.  That section of the Act specifies a condition precedent with which a customer must comply before the customer has the right to bring a civil action under the Act.  *Id.*

¶ 58　　Section 42-9-113 says that a customer may only file such an action if the customer made "written demand for the customer's damages from the motor vehicle repair facility by certified mail at

least ten days prior to the filing of any such action, exclusive of Saturday, Sunday, and any legal holiday." Because in my view, plaintiff, Marrou Concrete, Inc. (Marrou Concrete), did not comply with this condition precedent, I would reverse the judgment entered in favor of Marrou Concrete on its claims arising under the Act.

¶ 59 My dissent is a partial one because I join Parts I and II.A of Judge Sullivan's opinion. Defendants, KLR Enterprises Inc., d/b/a Specialty Auto Body (Specialty), and Rowley's Auto Collision Experts, Inc., d/b/a Iron Mountain Collision (Iron Mountain), do not appear to challenge the judgment entered in favor of Marrou Concrete on its breach of contract claim against Specialty. Accordingly, I agree with Part II.C of Judge Sullivan's opinion to the extent it affirms the breach of contract judgment entered against Iron Mountain.

¶ 60 For the reasons I discuss below, I also agree with Judge Jones's persuasive analysis of section 42-9-113 in his concurrence dubitante. I join his opinion except for the first, penultimate, and ultimate paragraphs, in which Judge Jones explains his reasons for agreeing with Judge Sullivan's affirmance of the judgment for Marrou Concrete on its claims under the Act. I respectfully

disagree with Judge Jones's conclusion that section 42-9-113 fails to provide sufficient guidance regarding the information a customer must include in the written demand specified in section 42-9-113. I believe the statute is sufficiently clear to support a holding that Marrou Concrete's settlement demand failed to comply with section 42-9-113.

## I.      The Meaning of Section 42-9-113

¶ 61      I believe that section 42-9-113, while not a paragon of legislative clarity, is sufficiently clear to compel reversal of the judgment entered in favor of Marrou Concrete on its claims premised on the Act. I next turn to the structure and meaning of that statute.

¶ 62      The Act regulates the motor vehicle repair industry. Section 42-9-101 sets forth the Act's short title; section 42-9-102, C.R.S. 2024, contains definitions (but not a definition of "damages"); sections 42-9-103 through -109.5, C.R.S. 2024, address specific industry practices; and section 42-9-110, C.R.S. 2024, exempts antique motor vehicles from the Act. Section 42-9-111, C.R.S. 2024, prohibits certain acts by motor vehicle repair facilities, their employees, or their contract laborers. The next section identifies

criminal penalties for violating the Act. *See* § 42-9-112, C.R.S. 2024. The Act culminates in the "[c]ivil penalties" section. § 42-9-113.

¶ 63 Section 42-9-113 says,

> In any civil action for the enforcement of this article, the court may award reasonable attorney fees and costs to the prevailing party, and a customer shall be entitled to treble damages for failure of any motor vehicle repair facility or any employee of such facility to comply with this article, except for clerical errors or omissions; but in no event shall such damages be less than two hundred fifty dollars. The customer shall first make *written demand for the customer's damages* from the motor vehicle repair facility by certified mail *at least ten days prior to the filing of any such action*, exclusive of Saturday, Sunday, and any legal holiday. *Such action* shall be brought within the time period prescribed in section 13-80-103, C.R.S. [2024].

*Id.* (emphases added).

¶ 64 The first sentence of section 42-9-113 sets forth the monetary relief that a customer may obtain in a civil action under the Act. The second sentence of the statute is central to this appeal. It mandates a particular type of written demand and says a customer must make such demand "at least ten days prior to the filing *of any such action*," exclusive of Saturdays, Sundays, and legal holidays.

*Id.* (emphasis added). The third sentence notes the statute of limitations that governs civil actions brought under the Act.

¶ 65 The statute could have said that a customer "shall first make written demand by certified mail at least ten days prior to the filing of any such action," without prescribing the content of the written demand. But that is not what the statute says. The General Assembly added a critical qualifier to the written demand requirement: Only a written demand "for the customer's damages" can trigger the right to "fil[e] . . . any such action." *Id.* In interpreting a statute, "we aim to give effect to every word and presume that the legislature did not use language idly." *Nieto v. Clark's Mkt., Inc.*, 2021 CO 48, ¶ 21, 488 P.3d 1140, 1145.

¶ 66 Marrou Concrete contests this reasonable reading of section 42-9-113 and instead asserts that the purpose of the written demand is merely to "provid[e] notice that a customer seeks damages for an alleged violation of the [Act]." This argument, however, would require us to ignore the reference to "the customer's damages" in the statute. "[J]ust as we may not add words to a statute, neither may we ignore the words selected by the General

Assembly." *Hobbs v. City of Salida,* 2024 COA 25, ¶ 35, 550 P.3d 193, 200 (*cert. granted on other grounds* Sept. 30, 2024).

¶ 67     The qualifier makes sense.  The statute requires the customer to inform the facility of the dollar amount that the customer reasonably believes it could recover if the customer prevailed in a civil action under the Act.  As Iron Mountain and Specialty note, this demand requirement allows prospective defendants to understand their potential exposure if the dispute with the customer proceeds to litigation.  Disclosure of the customer's damages allows the prospective defendants to assess the economics of a possible settlement and whether they should instead take on the risk of litigation.  Thus, I read section 42-9-113 to mean that a customer who failed to disclose the amount of his or her damages in the written demand did not comply with the written demand requirement.

¶ 68     There are significant consequences for customers who fail to comply with the written demand requirement.  In my view, under the plain meaning of section 42-9-113, a customer who does not comply with the requirement is barred from bringing an action under the Act.

¶ 69    Section 42-9-113 says the customer must make written demand for his or her damages "at least ten days prior to the filing of any such action."  The term "any such action" refers back to the first clause of section 42-9-113: "any civil action for the enforcement of this article."  The second sentence of the statute means that the customer must "first" comply with the written demand requirement within the specified number of days "prior to . . . filing" a lawsuit under the Act.  The statute therefore means that a customer who has not provided the motor vehicle repair facility with written demand for his or her damages, as section 42-9-113 requires, may not bring a "civil action for the enforcement of" the Act.

¶ 70    The third sentence of section 42-9-113 confirms this reading of the second sentence.  The third sentence says that "[s]uch action shall be brought within the time period prescribed in section 13-80-103."  "Such action" must mean "any civil action for the enforcement of this article," as referenced in the first sentence.  Thus, the written notice requirement in the second sentence applies to the same category of lawsuits addressed in the third sentence — every civil action filed under the Act.  *See Int'l Brotherhood of Elec.*

41

*Workers v. Ill. Bell Tel. Co.*, 496 F.2d 1, 2-3 (7th Cir. 1974) (determining that "any such action" in 29 U.S.C. § 411(a)(4) means "an action in any court" instituted by a member of a labor organization, as described earlier in the statute, and, therefore, holding that the statute did not apply to such members' affirmative defenses or counterclaims in actions filed against them by a labor organization); *Kirby v. Mercury Sav. & Loan Ass'n,* 755 F. Supp. 445, 446-47 (D.D.C. 1990) (concluding that "any such action" in 12 U.S.C. § 1441a(*l*)(3) (1990) (repealed 2010) referred back to "any civil action" in 12 U.S.C. § 1441a(*l*)(1) and, therefore, the Resolution Trust Corporation had the right to remove the case from California state court to the United States District Court for the District of Columbia).

¶ 71 Thus, the second sentence of the statute means that a customer cannot bring "any civil action for the enforcement" of the Act unless the customer made "written demand for the customer's damages from the motor vehicle repair facility by certified mail" within the specified time period. § 42-9-113. Accordingly, I agree with Judge Jones that "the failure to comply with the written demand requirement is a bar" to a civil action under section

24-10-109, C.R.S. 2024.  *Supra* ¶ 47 n.3 (J. Jones, J., concurring dubitante).

¶ 72    (This case does not present the question of whether a customer may, as Marrou Concrete did, assert both a claim arising under the Act and a breach of contract claim to seek legal redress for the same problematic motor vehicle repairs.  In any event, a customer has an incentive to plead a claim under the Act because, unlike common law breach of contract claims, claims filed under section 42-9-113 allow a prevailing customer to recover "reasonable attorney fees," costs, and treble damages.)

## II.    Counsel for Marrou Concrete's Communications to Iron Mountain and Specialty's Counsel

¶ 73    I next turn to the language of the two written communications from counsel for Marrou to Iron Mountain and Specialty's counsel — an email dated February 11, 2022, and a letter dated April 14, 2022 — to determine whether Marrou Concrete provided Iron Mountain and Specialty with a "written demand for [its] damages" as section 42-9-113 requires.  Marrou Concrete's entitlement to file a civil action under the Act rests on whether those two written communications complied with the statute.

¶ 74    In the February 11 email, Marrou Concrete's counsel said: "After speaking with my clients, they would be willing to resolve this matter by selling the Audi in your client's possession to your client for $70,000.  Please let me know your client's position."  In the relevant portion of the April 14 letter, Marrou Concrete's counsel said: "My clients demand payment of the damages they have suffered due to your clients' violation of the [Act], which amounts are included in the offer to resolve this matter that my clients made via email on February 11, 2022."

### A.    The Meaning of "Damages" and "Included"

#### 1.    The Definitions of These Words

¶ 75    A determination of whether Marrou Concrete complied with the written demand specified in section 42-9-113 requires an analysis of the meaning of "damages" in the statute, *see Bartenders & More v. Colo. Dep't of Lab. & Emp.*, 2023 COA 123, ¶ 32, 545 P.3d 975, 982 (explaining that courts construe unambiguous statutory language "as written and apply its words in accordance with their plain and ordinary meaning"), and the word "included" found in the April 14 letter, *see Bradley v. Sch. Dist. No. 1*, 2021 COA 140, ¶ 16, 504 P.3d 979, 983 (interpreting the plain words, clear message, and

obvious meaning of the notice letter that plaintiff's counsel sent to the defendants).

¶ 76 I do not write on a blank slate in interpreting "damages." Divisions of this court have defined that word. Damages are "a measure of the loss or harm, generally in the form of pecuniary compensation, resulting from an injury suffered by a person because of the unlawful act, omission, or negligence of another." *Wilcox v. Clark*, 42 P.3d 29, 30 (Colo. App. 2001). "[T]he recitation of damages suffered . . . describes the recovery to be sought once the claim is established." *Artery v. Allstate Ins. Co.*, 984 P.2d 1187, 1192 (Colo. App. 1999), *abrogated on other grounds by Clementi v. Nationwide Mut. Fire Ins. Co.*, 16 P.3d 223, 224, 228-30 (Colo. 2001), *and Friedland v. Travelers Indem. Co.*, 105 P.3d 639, 645 (Colo. 2005).

¶ 77 In addition, "included" means "to take in or comprise as a part of a whole or group" or "to contain between or within." Merriam-Webster Dictionary, https://perma.cc/AP2F-KV9V. A more complete definition is "to place, list, or rate as a part or component of a whole or of a larger group, class, or aggregate" or "take in, enfold, or comprise as discrete or subordinate part or item of a

45

larger aggregate, group, or principle." Webster's Third New International Dictionary 1143 (2002).

### 2. Applying the Definition of "Damages"

¶ 78 Marrou Concrete's argument that its lawyer communicated Marrou Concrete's alleged damages in the February 11 email and the April 14 letter collapses upon close scrutiny.

¶ 79 Neither the February 11 email nor the April 14 letter discloses the measure of Marrou Concrete's "loss or harm . . . resulting from an injury suffered by [Marrou Concrete] because of the unlawful act, omission, or negligence" of Iron Mountain and Specialty. *See Wilcox*, 42 P.3d at 30. Nor did those communications "describe[] the recovery [that Marrou Concrete would seek] once [its] claim [was] established." *Artery*, 984 P.2d at 1192.

¶ 80 Marrou Concrete's lawyer did not say, or even suggest, in the February 11 email that $70,000 less the unspecified value of the Audi approximated the amount of Marrou Concrete's damages. The email did not even include the word "damages." Nor did it refer to Marrou Concrete's losses resulting from the allegedly botched repairs to the Audi. In sum, I believe it is impossible to glean the amount of Marrou Concrete's damages from the email.

¶ 81    I respectfully disagree with Judge Sullivan's assertion that Marrou Concrete's written demand merely needed to provide Iron Mountain and Specialty with notice of "the amount that they would have to pay Marrou Concrete to prevent its . . . lawsuit from moving forward." *Supra* ¶ 27.  In my view, this point highlights the distinction between the amount in a settlement demand and the amount of a party's damages.  As I explained above, only a written demand that conveys the latter figure satisfies section 42-9-113's condition precedent.

¶ 82    Accordingly, the February 11 email represented an opening salvo in settlement negotiations; the horse trading that has kept many a mediator in business.  Seasoned neutrals know that their goal in mediations is to guide the parties in reaching agreement on settlement terms and that the monetary component of a settlement may bear little resemblance to the amount of damages the demanding party could obtain at trial.  This is so because parties may decide to settle a dispute for a myriad of reasons, such as to avoid negative publicity, to spare themselves the risk and cost of litigation, or to avoid forcing a key executive to spend days or weeks in a courtroom.

### 3. Applying the Definition of "Included"

¶ 83    The April 14 letter from Marrou Concrete's counsel to Iron Mountain and Specialty's counsel also did not disclose the amount of damages Marrou Concrete believed it had incurred as a result of Iron Mountain's and Specialty's alleged automotive malfeasance. That letter did not contain a damages figure but, instead, merely referenced the February 11 email. In the letter, Marrou Concrete's counsel said that Marrou Concrete's damages were "included in" the settlement demand set forth in the email.

¶ 84    Applying the definition of "included" noted above, Marrou Concrete's counsel in effect said in the April 14 letter that Marrou Concrete's damages were "a part of or [a] component" of the demand that Iron Mountain and Specialty pay Marrou Concrete $70,000 in exchange for the Audi. The amount of Marrou Concrete's damages was only a "discrete or subordinate part" of that demand. For this reason, I respectfully disagree with Judge Sullivan's conclusion that the $70,000 component of the settlement demand was "the same amount as its demanded damages." *Supra* ¶ 1.

¶ 85    Even if the amount of Marrou Concrete's damages was "included in" the settlement demand conveyed through the

February 11 email, Marrou Concrete's counsel did not provide Iron Mountain and Specialty's counsel with sufficient information to deduce the amount of Marrou Concrete's damages from the demand. In the April 14 letter, Marrou Concrete's counsel essentially said that the amount of Marrou Concrete's damages was subsumed somewhere within the value of the settlement demand. The letter was akin to a pirate's treasure map that fails to disclose where the chest of riches is buried.

¶ 86    For these reasons, I conclude that the economic value of the demand in the February 11 email was not the amount of Marrou Concrete's damages. (The draft complaint that Marrou Concrete's counsel attached to the April 14 letter also failed to reveal the amount of Marrou Concrete's damages; that pleading did not include any damages figure.) Thus, in my view, Marrou Concrete was not entitled to assert a civil action under the Act because its counsel did not comply with the written demand requirement in section 42-9-113.

### B.    Marrou Concrete's Concession

¶ 87    There is a further reason to reverse the judgment entered in favor of Marrou Concrete on its claim arising under the Act: Marrou

Concrete's concession in its answer brief that it did not include a damages figure in its counsel's prelitigation communications with Iron Mountain and Specialty's counsel. Marrou Concrete says that it "had no way of knowing the total amount or full scope" of its damages at the time its counsel sent the settlement demand to Iron Mountain and Specialty's counsel because "Defendants were in possession of the Audi and refused to release it to [Marrou Concrete] absent payment to which Defendants were ultimately found to be not entitled." This concession alone is fatal to Marrou Concrete's claim under the Act.

¶ 88 While I appreciate the difficulty of calculating the damages attributable to allegedly improper automobile repairs while the vehicle is still in the shop, the statute does not create an exception for customers under these circumstances. But nothing in section 42-9-113 requires that the customer specify its damages with precision in the mandatory written demand or that the customer provide a breakdown of each category of damages, much less that the demand match the customer's evidence of damages at a subsequent trial. The statute merely requires that a customer include a good faith damages figure in the customer's written

demand or, at the very least, provide a roadmap for finding that figure.

¶ 89    Moreover, as noted above, the third sentence of section 42-9-113 specifies that actions under the Act "shall be brought within the time period prescribed in section 13-80-103." The latter statute says that a cause of action subject to the statute "shall be commenced within one year after the cause of action accrues, and not thereafter." § 13-80-103(1).

¶ 90    Based on the date Marrou Concrete dropped off the Audi for repairs — October 27, 2021 — Marrou Concrete, conservatively, was required to file its lawsuit no later than October 26, 2022. Accordingly, Marrou Concrete had approximately seven months from the date of the April 14 letter to quantify its damages. So even if it was unable to calculate its damages when its counsel sent the April 14 letter, Marrou Concrete had seven additional months to conduct the due diligence necessary to determine the amount of its damages and to include that number in a written demand that complied with section 42-9-113.

### C. The Gap Between the Settlement Demand and the Damage Figures that Marrou Concrete Disclosed in the Litigation

¶ 91 While the figure contained in a customer's written demand under section 42-9-113 need not match the damages the customer later seeks at trial, a vast gap between those numbers can strongly suggest, as here, that the demand did not reflect the amount of the customer's damages.

¶ 92 Even if I were to disregard Marrou Concrete's concession, its counsel's failure to communicate Marrou Concrete's damages in the February 11 email and the April 14 letter is, in my view, readily apparent upon review of Marrou Concrete's disclosure of the amount of its damages in its litigation against Iron Mountain and Specialty. Those damages figures bear no resemblance to the demand that Iron Mountain and Specialty settle for $70,000 in exchange for the Audi, particularly in the absence of any estimate of the vehicle's value in the communications from Marrou Concrete's counsel.

¶ 93 For example, in the trial management order, Marrou Concrete disclosed the following categories of damages:

| Category of damages | Amount of damages |
| --- | --- |
| The sum that Allstate Fire and Casualty Insurance Company paid Specialty "and/or" Iron Mountain on November 10, 2021. | $1,695.79 |
| The maximum amount of Marrou Concrete's out-of-pocket expenses related to Iron Mountain's and Specialty's conduct. | $12,332.94 |
| The diminution in the value of the vehicle due to the unauthorized repair and disassembly of the vehicle. | Unspecified |
| The amount required to restore the vehicle to pre-loss condition. | $11,772.47 |
| Total amount of specified damages. | $25,801.20 |

¶ 94    Further, Jordan Marrou, the owner of Marrou Concrete, testified at trial that, in his opinion, the vehicle's disassembly and the bumper's imperfect color match reduced the Audi's value by approximately $3,000.  He also testified that the Audi lost a further approximately $6,000 in value while it sat in Specialty's repair shop.  Hollie Marrou, Jordan's spouse, testified that Marrou Concrete incurred $1,200 in automobile registration fees while the

Audi was in the shop and that Marrou Concrete would have paid approximately $17,000 to rent another vehicle during that time.

¶ 95     In addition, according to Iron Mountain and Specialty, Marrou Concrete's expert witness testified, consistent with his report, that the cost of restoring the Audi to its pre-loss condition was approximately $11,772. Marrou Concrete does not challenge Iron Mountain and Specialty's characterization of the expert's testimony. (The record does not include a transcript of the expert's testimony, although it includes his report. While Marrou Concrete does not challenge Iron Mountain and Specialty's characterization of the expert's opinion testimony, we generally do not consider testimony that does not appear in the transcripts provided to us. *See Till v. People*, 581 P.2d 299, 299 (Colo. 1978) (An appellant "will not be permitted to take advantage of his own failure to designate the pertinent portions of the transcript as part of the record on appeal.").)

¶ 96     As the trial drew to a close and the jury deliberated, a juror tendered a written question: "What was the basis for the plaintiff's calculation of the $71,000 during mediation"? (The incomplete trial transcripts in the record contain little information regarding the

parties' mediation, much less the amount of any demands and counteroffers they made at the mediation. The juror may have meant to refer to the $70,000 figure in the February 11 email.)

¶ 97 The parties did not provide us with a transcript of the portion of the trial at which the attorneys discussed that juror question. Such colloquy might have shed light on the genesis of the $70,000 number in the February 11 email. In any event, the record shows that the court responded, "This question cannot be answered." At the conclusion of the trial, the jury awarded Marrou Concrete $10,500 in actual damages.

¶ 98 Not one of the damages numbers noted above, taken together or separately, comes anywhere close to the value of the settlement demand communicated in the February 11 email and referenced in the April 14 letter. This confirms for me that the February 11 email and the April 14 letter did not disclose Marrou Concrete's damages to Iron Mountain and Specialty.

### III. Conclusion

¶ 99 In my view, Marrou Concrete's counsel failed to provide Iron Mountain and Specialty's counsel with a written demand for his client's damages before Marrou Concrete filed this action. In the

absence of a "written demand for . . . damages," Marrou Concrete was not entitled to bring a civil action under the Act. Consequently, I would reverse the court's entry of judgment in Marrou Concrete's favor on its claim under the Act.

¶ 100 For these reasons, I respectfully dissent from Part II.B of Judge Sullivan's opinion while joining Parts I and II.A of the opinion and Part II.C of the opinion to the extent that Judge Sullivan holds that Iron Mountain is liable to Marrou Concrete for breach of contract.